UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN OSBORNE #649938,

        Plaintiff,                                  Hon. Sally J. Berens

v.                                         Case No. 1:22-cv-360

JEFFERY DUNN,

        Defendant.

_____/

**OPINION**

Plaintiff Ryan Osborne, a prisoner currently incarcerated with the Michigan Department of Corrections (MDOC), has sued Defendant Corrections Officer Jeffery Dunn pursuant to 42 U.S.C. § 1983, alleging that Dunn failed to protect him from an assault by another prisoner on August 23, 2020, at the Michigan Reformatory (RMI) in Ionia, Michigan. Presently before the Court is Defendant's Motion for Summary Judgment. (ECF No. 789.) The motion is fully briefed and ready for decision. The Court will **GRANT** the motion and dismiss Plaintiff's complaint with prejudice.[1]

**I. Background**

**A.    RMI Unit 1 Layout**

On August 23, 2020, Osborne was incarcerated at RMI and assigned to Housing Unit I-2-Outside. Dunn was working as the officer for the I-2-Outside cellblock, his second day in that position.[2] (ECF No. 79-2 at PageID.1043.) Housing Unit I is a five-story building with two

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the Court conducting all proceedings in this case, including entry of a final judgment and all post-judgment matters.

[2] The MDOC closed RMI in November 2022. *See* https://www.michigan.gov/corrections/prisons/closed-facilities/michigan-reformatory (last visited Mar. 20, 2025).

cellblocks on each floor, one with windows facing the interior of the prison, designated "Inside," and one with windows facing the outside of the prison, designated "Outside." Each cellblock is several hundred feet long and—with the exception of the first floor, which contains 44 one-man segregation cells—contains 44 two-man cells for a total of 88 prisoners each. (*Id.* at PageID.1043–44.) Stairs run from the ground floor to the fifth floor, which prisoners enter from the yard to go to their respective floor and cellblock. An officer is stationed on each floor near the stairwell, with a bulkhead (dividing wall) between the officer and the cellblock. (*Id.* at PageID.44.) Prisoners enter the cellblock through a large door at the bulkhead. The bulkhead also has two windows with bars in front of them, through which officers view the cellblock. The part of the cellblock between the bulkhead and the first prisoner cell contains a closet, a bathroom, phone rooms, and showers. In addition, the area has a prisoner water station, a table with microwave ovens, a computer kiosk, and sometimes other large items such as a laundry bin on wheels. (*Id.*)

**B.    Osborne's Version**

In his verified complaint, Osborne alleged that on August 23, 2020, prisoner Todd Lavalle approached him from behind and began stabbing him in the right side of his neck several times with a "prison made weapon." (ECF No. 1 at PageID.3.) He further alleged that Dunn "sat 5 feet away" from Osborne and watched "the attack for over 13 ½ minutes" without intervening or responding to protect Osborne from Lavalle's attack. (*Id.*) During his deposition, when asked about his "5 feet away allegation," Osborne testified that the statement was a "clerical error," and that Dunn was "sitting in his chair" "15 feet" away from Osborne. (ECF No. 79-3 at PageID.1054–55.) Osborne said that during the fight, he could see Dunn looking at him through the window and that Dunn was sitting in a chair during the entire fight watching Osborne getting stabbed. (*Id.* at PageID.1060–61, 1063.) Osborne testified that Dunn remained in his chair the entire time, and he

said he saw Dunn actually lean back in his chair with his arms folded while watching the fight. (*Id.* at PageID.1061, 1064.) Osborne said that when he finally walked up to Dunn at the bulkhead, Dunn just sat there in his chair at his desk and commented, "oh, I didn't think it was that bad." Osborne testified that Dunn never moved from his chair until Osborne walked past him, at which point Dunn called for assistance. (*Id.* at PageID.1057, 1059.)

### C.    Dunn's Version

Dunn states that he first became aware of the incident when he saw Osborne walking up the cellblock towards his post behind the bulkhead and noticed that he was bleeding and appeared to be injured. (ECF No. 79-2 at PageID.1044.) He states that prior to that time, he was not aware that Osborne had been injured or had been involved in an altercation. He further states that he had no previous information indicating that Osborne was in danger of being assaulted or harmed and that he learned of the altercation with Lavalle only after viewing the surveillance video. (*Id.*)

### D.    Surveillance Video

In support of his motion, Dunn has submitted surveillance video of the I-2-Outside cellblock hallway where the incident occurred from four camera views: (1) RMI-2516 I-2 Out-Stairs A; (2) RMI-2517 I-2 Out Cell 2 Down Hall; (3) RMI-2518 I-2 Out Cell 7 to Bulkhead; and (4) RMI-2545 I-2 Out Cell 34 to Bulkhead. (ECF No. 79-2 at PageID.1045.)

**<u>RMI-2517 I-2 Out Cell 2 Down Hall.</u>** This view is from a camera mounted approximately above cell 2 looking down the cellblock away from the bulkhead. RMI-2517 provides the best view of the fight. (*Id.*) The video opens with prisoners returning to their cells from yard time after coming up the stairs and walking past Dunn's post on the other side of the bulkhead. At approximately 9:05:07, Lavalle (white male, shaved head, wearing a white long sleeve tee-shirt and blue pants with an orange stripe), approaches Osborne (white male wearing blue hat, white

tee-shirt, blue shorts, and white shoes) from behind and jabs Osborn's neck/face several times with an object in his hand. The two prisoners fight while moving down the hallway until approximately 9:05:20, when they separate. At approximately 9:05:30, Osborn enters his cell (cell 10), and Lavalle continues down the hallway (away from the bulkhead) and eventually enters his cell (cell 22).

At approximately 9:06:08, Osborne exits his cell and walks down the hall towards Lavalle's cell and away from Dunn's post. Osborne turns around and reenters his cell at approximately 9:06:36. At approximately 9:07:00, Osborne exits his cell again and turns towards Lavalle's cell as Lavalle is walking up the hallway. At approximately 9:07:10, Osborne walks up to Lavalle and begins punching Lavalle, and Lavalle fights back. The two prisoners continue pushing, punching, and grabbing each other until approximately 9:08:08, when they separate and briefly stop fighting. At approximately 9:08:17, as Lavalle attempts to walk away, Osborne punches him. At approximately 9:08:27, Lavalle again walks away down the hall towards his cell. At approximately 9:08:30, Osborne picks up a piece of broken glass, chases Lavalle down the hall, and swings at Lavalle with the glass in his hand near Lavalle's cell. Osborne continues to chase and swing at Lavalle until approximately 9:08:49, when he turns around and walks away. Osborne reenters his cell at approximately 9:09:10. Osborne remains in his cell until 9:19:34, when he exits and begins walking towards the bulkhead where Dunn is stationed.

**RMI-2518 I-2 Out Cell 7 to Bulkhead.** This view is from a ceiling-mounted camera located approximately at cell 7 looking toward the bulkhead. (*Id.* at PageID.1046.) This view shows the beginning of the altercation at 9:05:07 when Lavalle first attacked Osborne. After a few seconds, the prisoners go out of view of the camera. However, this angle also shows that during the initial and second, longer fight until the final time Osborne enters his cell before going to the

bulkhead area, there are numerous prisoners between the bulkhead window and the fight, obstructing Dunn's view down the hallway. At approximately 9:19:45, Osborne appears on camera walking towards the bulkhead. At approximately 9:19:55, as Osborne approaches, Dunn opens the door. Osborne walks through the door at approximately 9:20:11 as Dunn holds it open.

**RMI-2545 I-2 Out Cell 34 to Bulkhead.** This view is from a ceiling mounted camera at approximately cell 34 looking up the hallway towards the bulkhead. (*Id.* at PageID.1047.) Due to distance, the initial fight is difficult to see. At 9:05:48, Lavalle enters his cell. Lavelle exits his cell at 9:06:53 and walks towards the bulkhead. Although difficult to see, Osborne punches Lavalle at 9:07:10, and the two begin fighting. At 9:08:30, as Lavalle walks away, Osborne picks up a piece of glass and runs after Lavalle. Osborne swings at Lavalle with the glass and the two continue to fight for about another 45 seconds. At 9:19:34, Osborne exits his cell and walks towards the bulkhead.

**RMI-2516 I-2 Out-Stairs A.** This view shows the area outside the cellblock next to the stairs where Dunn was stationed. (*Id.* at PageID.1048.) The video beings with numerous prisoners coming up the stairs while Dunn stands at the desk as they pass by, heading either to I-2 Outside cellblock or another cellblock. During the time of the initial fight (9:05:07 to 9:05:20), Dunn watches and interacts with the prisoners as they walk by him. In other words, at no time does he look through the window into the cellblock. During the time of the second fight (9:07:10 to 9:08:49), Dunn stands at the desk operating the control box. Dunn remains standing during the entire video. At approximately 9:19:53, Dunn appears to notice something and opens the bulkhead door. At approximately 9:20:03, Dunn uses his radio to call for backup. Osborne reaches the bulkhead door at approximately 9:20:10. A responding officer shows up almost immediately after Osborne walks through the door, and several more officers arrive a short time later.

## II. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

Osborne alleges that Dunn violated his Eighth Amendment rights by failing to protect him from a substantial risk of harm—the assault by Lavalle. A failure-to-protect claim is governed by essentially the same standards as a claim for deliberate indifference to an inmate's serious medical needs. That is, a plaintiff must establish that the defendant was deliberately indifferent to "a substantial risk" that he might suffer "serious harm." *Greene v. Bowles*, 361 F.3d 290, 293 (6th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). A failure-to-protect claim has both an objective and a subjective component. To satisfy the objective component, the plaintiff must show that, absent reasonable precautions, he was exposed to a substantial risk of serious harm. *Farmer*, 511 U.S. at 836. To satisfy the subjective component, the plaintiff must show that the defendant acted with deliberate indifference, that is, the plaintiff must demonstrate that the defendant was "subjectively aware of the risk," but failed "to take reasonable measures to abate it." *Greene*, 361 F.3d at 294 (quoting *Farmer*, 511 U.S. at 829, 847). Specifically, the plaintiff must demonstrate that: (1) the defendant was aware of facts from which the inference could be

6

drawn that a substantial risk of harm would exist if reasonable measures were not taken; (2) the defendant actually drew the inference; and (3) the defendant disregarded that risk. *Farmer*, 511 U.S. at 837. To prevail on the specific claim that a defendant failed to protect him from an assault by another inmate, the plaintiff must establish: (1) the defendant had reason to believe another inmate would assault plaintiff; and (2) the defendant had both the opportunity and means to prevent the assault. *See, e.g., Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013).

As noted above, in deciding a motion for summary judgment, a court must construe the facts and all reasonable inferences arising from the facts in favor of the non-moving party, here, Osborne. But this rule applies "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Rule 56(c)). In *Scott*, the Supreme Court held that video from the dashboard camera of a police vehicle taken during a high-speed chase created an indisputable factual record for purposes of summary judgment. The Court noted that the plaintiff's version, as adopted by the court of appeals, suggested that the plaintiff, "rather than fleeing from police, was attempting to pass his driving test." *Id.* at 379. On the other hand, the Court said,

> [t]he videotape tells quite a different story. There we see [the plaintiff's] vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

*Id.* at 379–80 (footnotes omitted). The Court held that this evidence compelled summary judgment: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

Here, the video evidence blatantly contradicts Osborne's version of events. As noted, he alleged in his complaint that, while Lavalle attacked him, Dunn sat five feet away watching the "attack for over 13 ½ minutes" without intervening or responding to protect Osborne from Lavalle. (ECF No. 1 at PageID.3.) In his deposition, Osborne changed his version to 15 feet away but maintained that Dunn sat at his desk the entire 13 ½ minutes just watching Osborne get stabbed, and at one point folded his arms and leaned back in his chair while watching. (ECF No. 79-3 at PageID.1061, 1064.) Osborne also testified that he had a "direct line of sight" to Dunn and "could see him just fine." (*Id.* at PageID.1057.) Osborne also claimed that Dunn did nothing until Osborne walked past him, and then called for assistance. (*Id.* at PageID.1057, 1059.)

In light of the video evidence, no reasonable jury could believe Osborne's version. First, Dunn was not 15, 20, or even 50 feet away from the fight, but at all times was more than 100 feet away, and much of the time more than 200 feet away.[3] Second, the video shows Dunn standing the entire time, meaning that Dunn never sat in a chair and thus never once leaned back with his arms folded during the incident, as Osborne claims. Third, the video evidence refutes Osborne's assertion that he could see Dunn clearly during the first and second fights. The RMI-2518 Out Cell 7 to Bulkhead view shows numerous prisoners standing near the bulkhead window, as well as a porter with a mop bucket standing further up the hallway closer to the fight, all obscuring Dunn's view down the hallway towards the fight. The RMI-2517 I-2 Out Cell 2 Down Hall view shows additional prisoners in the other direction during both fights further obscuring the view by standing or walking in front of Osborne and Lavalle. Moreover, the surveillance cameras were mounted on

---

[3] The parties conducted an on-site inspection of RMI on September 10, 2024, during which measurements were taken from the bulkhead to various cell locations. (ECF No. 70; ECF No. 79 at PageID.1032 n.3.) The distance from the bulkhead to cell 7—the area in which Lavalle first attacked Osborne—was at least 103 feet away and the distance to cell 25—where the second fight occurred—was approximately 220 feet away. (*Id.* at PageID.1032.)

the ceiling, meaning that it would be even more difficult at eye level to see the fights from the bulkhead through the prisoners in the hallway. Fourth, although Osborne still maintains that "[t]he attack lasted 13 minutes altogether . . . [,] [a]ll the while, [Osborne] was defending himself" (ECF No. 83 at PageID.1088), the video evidence shows that this assertion is false. Both fights together lasted less than a total of two minutes. Osborne spent most of the remaining time alone (or at least not in Lavalle's presence) in his cell. In fact, for purposes of analyzing the failure-to-protect claim, there were really two separate fights rather than one continuous fight, the first originating with Lavalle's attack of Osborne from behind and lasting for 13 seconds and the second originating about two minutes later when Osborne walked towards Lavalle's cell and began punching Lavalle as he walked towards Osborne. Finally, Dunn did not wait until Osborne walked past him to call for assistance, as Osborne claims, but instead called for assistance prior to the time Osborne reached the bulkhead door. Although Osborne asserts that *Scott* does not apply here because these are "only minor inconsistencies which are not blatant, or material," (*id.* at PageID.1091–92), this assertion lacks merit because these inconsistencies go to the heart of Osborne's claim.

### A.    Initial Fight

Osborne fails to establish an Eighth Amendment violation based on the first fight arising out of Lavalle's unprovoked and random attack because he cannot establish either element of his claim. First, Osborne cannot show that Dunn subjected him to a substantial risk of harm. It is undisputed that Dunn had no information that Osborne was at risk of attack by Lavalle or any other prisoner, and Osborne testified that he had no idea why Lavalle attacked him. (ECF No. 79-3 at PageID.1054.) *See Lewis v. McClennan*, 7 F. App'x 373, 375 (6th Cir. 2001) (noting that "a hypothetical risk of danger to [the plaintiff's] safety prior to the attack" is insufficient to support an Eighth Amendment claim); *Carrasco v. Annucci*, No. 17-CV-09643, 2020 WL 5038561, at *3

(S.D.N.Y. Aug. 26, 2020) ("Courts routinely deny deliberate indifference claims based upon surprise attacks." (internal quotation marks omitted)). In short, there was no reason to believe that Osborne was at risk of harm. Osborne also cannot establish the subjective prong of his claim. As noted, the RMI-2518 I-2 Out-Stairs A view shows that while the initial fight was occurring (9:05:07 to 9:05:20), Dunn was watching and interacting with prisoners as they walked by him rather than looking out the bulkhead window at the cellblock. Thus, the video shows that Dunn would not have seen this fight, nor could Osborne have seen Dunn watching the fight during this time.

**B.    Second Fight**

After the first fight ended, Osborne and Lavalle went into their respective cells. At this point, Osborne could and should have walked to Dunn's post for help but chose not to. Instead, about 40 seconds after entering his cell, Osborne left it and walked in the other direction towards Lavalle's cell and then turned around and went back to his cell. About 25 seconds later, Osborne left his cell again and, instead of going to seek help from Dunn, turned the other way and walked towards Lavalle's cell. Osborne then punched Lavalle as he was walking up the hallway, initiating the second fight. Osborne continued to engage Lavalle and twice sought to prolong the fight as Lavalle was walking away, even picking up a piece of glass at one point to attack Lavalle.

As stated in *Chappell v. Woods*, No. 1:17-cv-80, 2019 WL 1305859, at *3 (S.D. Ohio Mar. 22, 2019), "common sense and caselaw confirm that Plaintiff cannot prove a 'failure to protect claim' based on his starting a fight with another inmate." *See also Wallace v. Holloway*, No. 16-2390, 2018 WL 1937360, at *2 (W.D. Tenn. Apr. 24, 2018) (dismissing failure-to-protect claim, in part, because the plaintiff's allegations "show[ed] that [he] initiated two different fights with other inmates"). As noted in *Chappell*, substantial caselaw holds that a plaintiff may not maintain

a failure-to-protect claim where the plaintiff initiates the altercation that results in his injury. For example, in *Clark v. Johnson*, 181 F. App'x 606 (7th Cir. 2006), the plaintiff initiated the incident by throwing a book at his cellmate, who responded by pulling the plaintiff off the top bunk and breaking his arm. *Id.* at 607. The court affirmed the grant of summary judgment on the claim because "the risk to Clark was of his own making, and prison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner." *Id.* Similarly, in *Hailey v. Kaiser*, No. 99-7046, 1999 WL 1009614 (10th Cir. 1999), the Tenth Circuit held that the plaintiff could not maintain an Eighth Amendment claim because his own conduct proximately caused his injury. That is, the plaintiff admitted that he could have avoided the other prisoner, but instead engaged him in an altercation. *Id.* at *2. Many district courts have also reached the same conclusion. *See Cameron v. Menard*, No. 5:18-cv-204, 2024 WL 5290934, at *17 (D. Vt. July 1, 2024), *report and recommendation adopted*, 2024 WL 5165447 (D. Vt. Dec. 19, 2024) ("An inmate cannot initiate a fight and then fault prison officers and supervisors for failing to protect her from the fight."); *Constant v. Prack*, No. 16-CV-03985, 2022 WL 917528, at *8 (S.D.N.Y. Mar. 29, 2022) ("In such a situation (i.e., where Plaintiff pursues Reyes seeking retribution) Plaintiff could hardly be heard to complain that Defendants failed to protect him from the fight he sought out."); *Rosenblum v. Orange Cnty. Sheriff Dep't*, No. SA CV 18-966, 2021 WL 933750, at *11 (C.D. Cal. Feb. 10, 2021) ("An inmate who initiates an altercation with another inmate cannot properly maintain a claim that correctional officials failed to protect the initiating inmate, prior to the altercation, from harm inflicted by the other inmate."), *report and recommendation adopted*, 2021 WL 2420412 (C.D. Cal. May 7, 2021); *Vickers v. Jensrud*, No. 3:12-cv-02102, 2014 WL 2592692, at *7 (D. Or. June 9, 2014) ("If the inmate voluntarily encountered the source of the risk of harm, then his own conduct is a superseding cause

of the injuries absolving the allegedly indifferent officer of liability."); *Louis-Charles v. Courtwright*, No. 9:11-cv-147, 2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014) (holding that the plaintiff failed to raise a triable issue of fact on the first prong of his failure-to-protect claim because "[t]he undisputed evidence shows that he was the physical aggressor in each of his altercations with other inmates"); *Lemmons v. Durant*, No. 10–3030, 2011 WL 4633104, at *3 (C.D. Ill. Oct. 4, 2011) ("[S]tarting a fight or voluntarily participating in one and then getting the worst of it does not create a failure to protect claim.").

While it is undisputed that Lavalle initiated the altercation, it is likewise undisputed that the ensuing fight was over in approximately 13 seconds and that Osborne and Lavalle separated and returned to their cells. That fight was over, and Osborne was no longer defending himself from an attack. Similar to the foregoing cases, Osborne had a choice to seek help from Dunn and avoid further contact with Lavalle or to reengage with Lavalle. Because Osborne chose that latter course and became the aggressor, or at least a willing participant, he cannot be heard to complain that Dunn failed to protect him from a situation of his own making.[4]  Osborne's own conduct was thus "a superseding cause of the injuries absolving . . . [Dunn] of liability." *Vickers*, 2014 WL 2592692, at *7. Accordingly, Osborne fails to establish a genuine issue of material fact on his claim, and Dunn is entitled to summary judgment.[5]

---

[4] In opposing Dunn's motion, Osborne presents deposition testimony from two prisoner witnesses, Todd Maneke and Joe Williams. (ECF Nos. 83-1 and 83-2.) In light of the video evidence, neither witness's testimony defeats Dunn's motion.

[5] Dunn also contends that he is entitled to qualified immunity. Because the Court concludes that Osborne cannot establish a failure-to-protect claim, it finds no need to address qualified immunity.

### IV. Conclusion

For the reasons set forth above, the Court will **grant** Dunn's Motion for Summary Judgment (ECF No. 78) and dismiss Osborne's complaint with prejudice.

A separate Order consistent with this Opinion will be entered.


Dated: March 26, 2025                                     /s/ Sally J. Berens
                                                    SALLY J. BERENS
                                                    U.S. Magistrate Judge